UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MONICA M. SLONAKER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN[1], )<br>Acting Commissioner of )<br>Social Security, )<br>)<br>Defendant. ) | CAUSE NO. 3:12-cv-304-CAN |

**OPINION AND ORDER**

On March 22, 2011, Plaintiff Monica M. Slonaker ("Slonaker") filed her complaint in this Court. On December 14, 2012, Slonaker filed her opening brief requesting this case be remanded for payment benefits, or in the alternative, be remanded with instructions to evaluate the evidence with regard to the plaintiff's physical impairments in a *de novo* review. On February 21, 2013, Defendant Acting Commissioner Carolyn W. Colvin ("the Commissioner") filed her response brief. Slonaker filed a reply brief on March 18, 2013. This Court may enter a ruling on this matter based on the parties' consent and 28 U.S.C. § 636(c).

**I.    PROCEDURE**

On April 13, 2009, Plaintiff filed an application for Disability Insurance Benefits, alleging disability beginning January 29, 2008. (Tr. 23). Plaintiff's claim for benefits was initially denied. (*Id.*). Plaintiff requested a hearing in front of an administrative law judge ("ALJ"). (*Id.*). On February 10, 2011, the ALJ held a hearing at which Plaintiff and a vocational expert ("VE") testified. (*Id.*). On March 22, 2011, the ALJ held that the plaintiff was limited to a range of light work and was not disabled because she could perform past relevant work as a

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the *Federal Rules of Civil Procedure*, Carolyn W. Colvin, in her official capacity only, is substituted as the defendant in this action.

shipping clerk, despite her limitations. (Tr. 23-40). On April 13, 2012, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (Tr. 2). Plaintiff filed her complaint in this Court on April 30, 2012, seeking judicial review.

## II. ANALYSIS

### A. Facts

Slonaker was a forty-three-year-old female at the time the ALJ denied her claims. She previously worked as a shipping clerk and as a psychiatric attendant. At the ALJ hearing, Slonaker testified that she was unemployed but spends a good deal of time on her hobby of making lotions and soaps, which she sells at craft fairs. She also indicated that she reserves venues at the fairs and interacts with customers.

In her testimony, Slonaker also stated that she was estranged from her husband, that she had partial custody of a six-year-old grandson, and that she lived alone. Slonaker reported that she was able to prepare complete meals in her home, to do household cleaning, to wash laundry, and to travel by walking, riding with friends, and driving. However, she indicated that she does not like driving in bad weather. Slonaker reported that she leaves her home for ninety minutes a day to comply with a treatment plan. Additionally, Slonaker reported that she travels to attend her grandson's football games, which could be as far as one hour away. For leisure activities, she reported that she sews and gardens in addition to making her lotions and soaps. Slonaker also stated that she uses a computer on a daily basis, often researching family genealogy.

Slonaker further testified that she was disabled and could no longer work because of workplace injuries to her arms and mental impairments. She also reported that she was unable to return to work at Logansport Psychiatric Hospital ("LPH"), where she worked as a psychiatric

attendant, because her doctor had permanently restricted her from repetitive lifting, pushing, or pulling over 120 pounds. (Tr. 57-58).

### 1. Medical Evidence Regarding Injury to Upper Extremities

Slonaker claimed an onset of disability date of January 29, 2008, due to injuries to her left elbow and right hand, severe anxiety and depression, and constant pain that limited her work. (Tr. 242-58). Slonaker applied for disability benefits after an incident on January 6, 2007, while she was working at LPH where she sustained injuries to her left elbow while moving an agitated patient. (Tr. 397, 637). She also injured her right arm in March 2007 at LPH reaching for a heavy patient chart that was falling from her hands. (Tr. 397).

On April 25, 2007, as part of the worker's compensation process following her workplace injuries, Slonaker began seeing Dr. Niles Schwartz at Fort Wayne Orthopedics and had x-rays done of the right wrist and thumb. (Tr. 397). Slonaker underwent physical therapy and received injections in her thumb based on Dr. Schwartz's prescription. (Tr. 399). On May 24, 2007, Slonaker indicated to Dr. Schwartz that she wanted to go back to work and he agreed to allow her to return to work. (Tr. 391).

In January 2008, Slonaker's right arm was injured again when an LPH patient hit her several times. (Tr. 415). In February 2008, Dr. Schwartz evaluated Slonaker and found no new fracture of the thumb. (Tr. 586). LPH put Slonaker on light duty as a result of this injury, as it had done after the other injuries, and ultimately placed her on short-term disability for several months and then long-term disability leave for two years. She never worked for LPH after the spring of 2008.

In May, 2008, Dr. Schwartz referred Slonaker to Integrity Physical Therapy for a Functional Capacity Evaluation ("FCE") to determine what she could and could not do at that

time. (Tr. 371, 415). The FCE revealed deficits in overhead reaching, low scores in high near and high far lifts, and five or six pound averages in static pinch strength of the right and left hands. (Tr. 420). Based on the FCE and in order to prevent further injury to Slonaker's arms, Dr. Schwartz restricted Slonaker's work activities permanently to frequent lifting up to 20 pounds, overhead lifting up to 15 pounds, carrying 20 pounds up to 30 feet, pushing 125 pounds up to 30 feet, and pulling 100 pounds up to 30 feet. (Tr. 368).

In June 2009, Slonaker was sent to Dr. Duan Pierce, M.D. for a consultative evaluation as part of her Social Security claim. (Tr. 595-97). Dr. Pierce noted that Slonaker had issues with her hands and anxiety. (Tr. 597). He opined that Slonaker was able to work at that time, but "would benefit from a job where she would not have to do any repetitive motions with her hands secondary to her injury and carpal tunnel disease." (*Id.*). Dr. M. Brill, M.D., also performed a consultative examination and completed a Physical Residual Functional Capacity Assessment form on August 18, 2009. In his report, Dr. Brill noted diagnoses of carpal tunnel syndrome and obesity. (Tr. 640). He defined some exertional and postural limitations for Slonaker but no manipulative, visual, communicative, or environmental limitations. (Tr. 641-47).

### 2. Medical Evidence Regarding Mental Health

Beyond her physical issues with her arms, Slonaker faced mental health concerns. On October 25, 2007, Dr. Hoover, Slonaker's primary care provider, diagnosed her with chronic anxiety not otherwise specified[2] and prescribed anxiety medication accordingly. (Tr. 541-42). An MRI of Slonaker's brain on November 1, 2007, showed no abnormality. (Tr. 539). Yet in December 2007, Slonaker complained of shortness of breath, heart racing, sweating, and tremors

---

[2] Anxiety disorder not otherwise specified is "prominent anxiety or phobias that don't meet the exact criteria for any of the other anxiety disorders but are significant enough to be distressing and disruptive." *Anxiety*, MAYO CLINIC.COM, http://www.mayoclinic.com/health/anxiety/DS01187/DSECTION=symptoms (last visited Aug. 27, 2013).

after which Dr. Hoover increased her dosage of anxiety medication. (Tr. 533). Slonaker had reported feeling very anxious about icy roads due to her son's death in an car accident. (*Id.*).

Subsequently, Dr. Hoover referred Slonaker to Dr. Michael Walker, a psychologist, who first assessed her on March 3, 2008. (Tr. 635-39). He originally diagnosed Anxiety Disorder without agoraphobia, borderline personality disorder characteristics, and a GAF of 62.[3] (Tr. 638). He stated that, "no problems were reported with memory or concentration," and that Slonaker "did not describe any problems with decision making, confusion, or distractibility." (Tr. 637). He reported that Slonaker's mood appeared angry and apprehensive and noted elements of depression and anxiety. (*Id.*). Dr. Walker treated Slonaker with cognitive therapy. (*Id.*).

Dr. Walker treated Slonaker regularly from March 2008 until October 2010, during which time he also coordinated prescription of medications with Dr. Hoover, Slonaker's primary care physician, because Dr. Walker did not have authority to prescribe as a psychologist. In Dr. Walker's notes dated April 14, 2009, he reported that Slonaker was looking for a place to volunteer some of her time. (Tr. 604).

However, on July 21, 2010, Dr. Walker completed a State of Indiana "Attending Physician's Statement" form on which he reported that he did not know when Slonaker would be able to return to work. (Tr. 751). On January 18, 2011, he also completed a "Medical Statement Concerning Claimant's Mental Health for Social Security Disability" form on which he checked boxes indicating that Slonaker has marked difficulty in social functioning and maintaining concentration, persistence, or pace. (Tr. 728). He also checked answers to questions noting that

---

[3] The Global Assessment of Functioning ("GAF") scale is a 100 point tool rating the psychological, social, and occupational functioning of people over the age of 18. It does not rate physical or environmental impairments. A GAF score of 41–50 indicates serious symptoms; a score of 51–60 indicates moderate symptoms; and a score in the range of 61–70 indicates mild symptoms. AM. PSYCHIATRIC ASS'N, DIAGNOSIS AND STATISTICAL MANUAL OF MENTAL DISORDERS 32–34 (4th ed. 2000).

5

Slonaker cannot sustain a regular work schedule and would most likely miss at least two days of work per month because of mental impairments. (Tr. 729).

On June 30, 2009, as part her disability evaluation, Slonaker was evaluated by an agency psychologist, Dr. Chad Pulver. (Tr. 592). He reported that Slonaker "employed minimal verbal content and did not maintain good eye contact." (*Id.*). He also noted that Slonaker's primary complaint was that she had problems getting to work due to her fear of bad weather related to the death of her son in a car accident in 2004. (*Id.*). Dr. Pulver reported a diagnosis of major depression and panic disorder, and assigned the Slonaker a GAF of 46 at that time. (Tr. 593).

On August 18, 2009, Dr. Stacia Hill, a consultative psychologist evaluated Slonaker's medical records as part of the process of evaluating her application for disability benefits. (Tr. 648-64). Dr. Hill requested information from Dr. Walker, Slonaker's psychologist, but never received it. (Tr. 664). Her review of Slonaker's medical records, however, led her to conclude that Slonaker's level of severity of functioning was moderately impacted but appeared reasonable for simple tasks. (*Id.*). In addition, Dr. Hill stated that Slonaker would be unable to complete complex tasks, but would be able to complete repetitive tasks on a sustained basis without special considerations. (*Id.*).

### 3. ALJ Analysis

In her decision, the ALJ found that Slonaker had not been engaged in substantial gainful activity since January 29, 2008. (Tr. 25). Next, the ALJ found that Slonaker had the following severe impairments: obesity, status post right carpal and cubital tunnel release, right thumb deformity, cervical and lumbar degenerative disk disease with radiculopathy, degenerative facet disease, spondyloisis, spondyloistheis, history of pseudoseizures, osteoarthritis of the back and shoulders, arthritis, obstructive sleep apnea, anxiety disorder, major depressive disorder, panic

disorder, and borderline personality disorder. (Tr. 26). The ALJ also found that Slonaker did not have an impairment or combination of impairments that met or medically equaled one on the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).

Furthermore, at step four the ALJ found that the Slonaker had a residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b). (Tr. 29-30). Specifically, the ALJ found that Slonaker

> may lift no more than twenty pounds at a time, with frequent lifting or carrying of objects weighting up to ten pounds; and stand and/ or walk, off and on, for a total of approximately six hours of an eight hour workday, with intermittent sitting except; she may never perform overhead reaching, and she may never climb ladders, ropes, or scaffolds. The plaintiff may no more than occasionally balance, stoop, crouch, kneel, crawl, or climb ramps or stairs. She must avoid all exposure to unprotected heights and never drive automotive equipment. The plaintiff is limited to simple, routine, and repetitive tasks consisting of one or two step tasks; in a work environment free of fast paced production requirements; involving only simple, work-related decisions, with few, if any workplace changes. She must be allowed "off task" up to five percent of the workday, in addition to regularly scheduled breaks. The plaintiff may have no interaction with the general public. She may have no more than occasional, superficial interaction with co-workers and no tandem tasks. The claimant may have no more than occasional supervision, and the nature of interaction with supervision is limited to superficial interaction. Finally, the claimant's work must tolerate one absence per month.

(*Id.*). Based on this RFC, the ALJ questioned a vocational expert ("VE") at the hearing in order to determine what positions a person of Slonaker's age and education could perform with her restrictions. (Tr. 39). In her opinion, the ALJ reported the VE's testimony that Slonaker's prior job as a shipping clerk[4] is classified as light exertion, unskilled work that a person with Slonaker's RFC could perform. (*Id.*). Therefore, because the ALJ found that the Slonaker retained the capacity to perform past relevant work, the ALJ determined at step four that Slonaker was not disabled as defined in the Social Security Act. (*Id.*). Consequently, her application for benefits was denied without any step five analysis.

---

[4] Dictionary of Occupational Titles (DOT) Number 222.678-022.

**B.     Standard of Review**

When substantial evidence in the record as a whole supports the final decision of the Commissioner and the Commissioner's final decision contains no error of law, it must be affirmed. 42 U.S.C. § 405(g); *see also Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 390 (1971). The ALJ, not the court, has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly. *Id.* at 399-400. A reviewing court is not to substitute its own opinion for that of the ALJ's or re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). An ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ need not provide a "complete written evaluation of every piece of testimony and evidence." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir.2004) (*quoting Diaz v.Chater*, 55 F.3d 300, 308 (7th Cir.1995)).

To be entitled to disability insurance benefits, Slonaker must establish that she is disabled. *See* 42 U.S.C. § 423(a)(1)(E). The Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant's impairment or combination of impairments is severe; (3) the claimant's

impairments meet or equal any impairment listed in the regulations and therefore is deemed so severe as to preclude substantial gainful activity; (4) the claimant is unable to perform her past relevant work given her RFC; and (5) the claimant can adjust to other work in light of her RFC. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If the ALJ finds that the claimant is disabled or not disabled at any step, he may make his determination without evaluating the remaining steps. 20 C.F.R. §§ 404.1520(a)(4). The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Young*, 362 F. 3d at 1000.

### C. Issues for Review

Slonaker has raised arguments that require the Court to review whether the ALJ properly determined Slonaker's RFC in light of repetitive use limitations due to her arm injuries. In addition, the Court must determine whether the ALJ committed error in her RFC determination by failing to grant controlling weight to Dr. Walker as a treating physician when assessing Slonaker's mental impairments. The Court must further determine if the ALJ committed legal error in denying Slonaker's claim at step four. Slonaker argues that the ALJ's determination that she could return to previous work as a "shipping clerk" contradicts the VE's testimony because (1) the ALJ failed to properly account for Slonaker's limitation of no overhead reaching and (2) the ALJ should have been aware of the conflicts between the RFC and the VE's testimony.

#### 1. The ALJ supported her determination of Slonaker's RFC with substantial evidence.

The RFC is "an administrative assessment of what work-related activity an individual can perform despite her limitations." *Dixon*, 270 F.3d at 1178. The ALJ must assess the claimant's RFC based on all of the relevant medical evidence. 20 C.F.R. § 404.1520(e). The ALJ is also responsible for developing a complete medical history, including arranging for a

consultative examination. 20 C.F.R. § 404.1545(a)(3). "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (citing S.S.R. 96–8p; *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir.2003)). For the reasons stated below, the Court finds that the ALJ supported her determination of Slonaker's RFC with substantial evidence.

### a. The ALJ properly assessed Slonaker's limitations due to her arm injuries.

Slonaker contends that the ALJ erred in determining Slonaker's physical RFC by failing to assess or adequately discuss the bilateral upper arm injuries, which caused her to leave her job as a psychiatric attendant at LPH. Slonaker argues that her record of pain when reaching, handling, and fingering should have required the ALJ to find a restriction on these activities. Specifically, Slonaker argues that the ALJ should have provided a function-by-function assessment of the issues related to Slonaker's arm injuries, including the pain resulting from repetitive use and reaching. Slonaker suggests that consultative examiner Dr. Pierce's opinion as well as the Integrity FCE supported restrictions on such repetitive use and reaching.

In her opinion, the ALJ fulfilled her obligation to assess all of Slonaker's medically determinable impairments as well as the intensity, persistence, and limiting effects of Slonaker's symptoms in determining Slonaker's RFC. As to Slonaker's arm injuries, the ALJ specifically noted Slonaker's surgery in 2003, before the alleged disability onset date, for right carpal tunnel and cubital tunnel syndrome and delineated the results of tests performed by Dr. Pierce when he examined Slonaker in June 2009. (Tr. 32).

Beyond this specific medical evidence regarding the condition of Slonaker's arm, the ALJ explained her conclusion that Slonaker's pain and symptoms were not as limiting as

Slonaker alleged. The ALJ considered the opinions of consultative physicians Dr. Brill and Dr. Pierce, in addition to Slonaker's primary care physcian Dr. Hoover, in light of all the evidence in the record including Slonaker's testimony at the hearing. The ALJ found that Slonaker's work making lotions and soaps as well as the extent of her daily activities signaled that her limitations were not as severe as she alleged. Consequently, the ALJ placed "considerable weight" on the opinion of Dr. Brill who examined Slonaker and opined in a Physical RFC Assessment dated August 2009, that Slonaker was capable of work at the light exertion level. Additionally, the ALJ gave "considerable weight" to Dr. Pierce's 2009 opinion in which he reported that Slonaker was able to work at that time. The ALJ also considered Dr. Hoover's treatment notes dated July 16, 2010, in which he reported that Slonaker "has no disability that he was aware of." (Tr. 38).

The ALJ did, however, discount Dr. Pierce's statement that Slonaker would benefit from a job that required no repetitive hand motions because such a restriction was not supported by the medical evidence of the record. (Tr. 38). Slonaker suggests that the May 2008 Integrity FCE supported Dr. Pierce's opinion on repetitive hand motions and was not addressed in the ALJ's opinion. However, the ALJ was not required to address every bit of evidence included in Slonaker's medical records in her opinion. Moreover, the ALJ succeeded in providing a logical bridge between the evidence in the record as a whole and her RFC determination without citing the FCE data. Furthermore, the ALJ did not ignore Slonaker's pain related to her arm injuries in crafting the RFC. The ALJ explicitly acknowledged Slonaker's pain and incorporated restrictions into the RFC accounting for the limiting effects of the pain and Slonaker's other physical impairments. For instance, the RFC limited Slonaker to simple, routine, and repetitive tasks consisting of one or two step tasks in a work environment free of fast paced production requirements. Therefore, the ALJ's RFC analysis regarding Slonaker's arm injuries was proper

leading to an RFC that effectively accounted for the limiting effects of her arm injuries as well as the objective medical evidence and Slonaker's testimony about her activities of daily living.

    b.  **The weight given to Dr. Walker's 2011 opinion and Dr. Hill's 2009 opinion by the ALJ is supported by substantial evidence.**

In determining the proper weight to accord medical opinions, the ALJ must consider all factors including the claimant's examining treatment relationship with the source of the opinion, the physician's specialty, the support provided for the medical opinion, and its consistency with the record as a whole. 20 C.F.R. § 404.1547(d)(1)-(6). A "treating source" is a medical professional who provides medical treatment or evaluation to the claimant and has or had an ongoing relationship with the claimant. 20 C.F.R. § 404.1502. An ongoing relationship exists when the medical record shows that the claimant saw the source frequently enough to be consistent with accepted medical practices for treatment of the medical condition. *Id.*

An ALJ must give a physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and if it is consistent with other substantial evidence in the record. *Hofslien v. Barnhart,* 439 F.3d 375 (7th Cir. 2006). Generally, the ALJ weighs the opinions of a treating source more heavily because he is more familiar with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). However, a claimant is not entitled to benefits merely because a treating physician labels her disabled. *Hofslien*, 439 F.3d at 376-77. A medical opinion may be discounted if it is internally inconsistent or inconsistent with other substantial evidence in the record. *Clifford*, 227 F.3d at 870. While the ALJ is not required to award a treating physician controlling weight, the ALJ must articulate, at a minimum, his reasoning for not doing so. *Hofslien*, 439 F.3d at 376–77. The ALJ's reasoning should be based on the relevant factors applied to all medical opinions as stated above. *See* 20 C.F.R. § 404.1527(d)(2)-(6).

In this case, Slonaker argues that the ALJ impermissibly granted little weight to Dr. Walker's January 18, 2011, opinion regarding Slonaker's mental RFC as he stated on the "Medical Statement Concerning Claimant's Mental Health for Social Security Disability" form ("the 2011 opinion") he completed one month prior to Slonaker's hearing. As a result, Slonaker concludes that the ALJ erred in determining Slonaker's mental RFC. In the opinion, however, the ALJ discussed Dr. Walker's opinions in great detail. The ALJ implied that Dr. Walker was a "treating source" by first establishing Dr. Walker as a medical professional who provided medical treatment or evaluation to Slonaker. (Tr. 34) ( "she sought professional health treatment with Michael Walker, Ed.D. . . ."). Second, the ALJ showed that Slonaker had an ongoing treatment relationship with Dr. Walker by outlining treatments notes reflecting visits from March 2008 through September 2009. (Tr. 34-38). As such, the ALJ demonstrated that Dr. Walker was a treating source.

Later in the opinion, however, the ALJ directly stated that she "gave [Dr. Walker's] opinion little weight as Dr. Walker is a therapist, not the claimant's treating and prescribing physician." (Tr. 38). Slonaker cites this statement as proof that the ALJ did not consider Dr. Walker to be a treating source. The Court is not persuaded.

The ALJ made this statement after citing Dr. Walker's opinion that Slonaker "has marked restriction in the areas of maintaining social functioning and in maintaining concentration, persistence, and pace; and that shse cannot sustain a regular work schedule," noted in the 2011 opinion and before explaining further that the 2011 "opinion is inconsistent with the evidence of record as [a] whole, including [Dr. Walker's] own treatment notes, that demonstrate the claimant is not as severely limited as the opinion suggests." (Tr. 38). Taking into account the ALJ's complete explanation of why Dr. Walker's 2011 opinion was given little

13

weight, the Court concludes that the ALJ actually valued highly Dr. Walker's treating relationship with Slonaker, as well as the opinions he reflected in his treatment notes, in determining Slonaker's mental RFC. Dr. Walker's statement in the 2011 opinion was only one opinion, and one that the ALJ clearly found inconsistent with Dr. Walker's own statements as well as with the rest of the record, including Slonaker's own comments at the hearing. Moreover, the ALJ carefully outlined these inconsistencies throughout her opinion.

Slonaker also challenges the ALJ's decision to grant considerable weight to the opinions of consultative psychologist Dr. Stacia Hill. Specifically, Slonaker found Hill's review less credible because her report indicated that she had requested records from Slonaker's treating psychologist—presumably Dr. Walker—but did not receive them. (Tr. 664). As such, Slonaker contends that Dr. Hill's opinions were not well informed. Again, the Court is not persuaded.

In a "Mental Residual Functional Capacity Assessment" conducted in August 2009, Dr. Hill opined that "while it is expected that [Slonaker] would be unable to complete complex tasks, [she is] able to complete repetitive tasks on a sustained basis without special considerations." (Tr. 664). However, the ALJ found that Dr. Hill's opinion was consistent with the record as a whole, including the evidence presented at the hearing. Because the ALJ gave considerable attention to Dr. Walker's treatment notes in her opinion, she apparently found Dr. Hill's opinion consistent with Dr. Walker's treatment notes even though Dr. Hill had not received them before conducting her review. Moreover, the ALJ added restrictions to Slonaker's RFC that exceeded the recommendations of Dr. Hill. Therefore, Slonaker was harmed neither by Dr. Hill's review of an incomplete medical record nor by the considerable weight given to Dr. Hill's opinion by the ALJ. Furthermore, the ALJ articulated substantial evidence to support the weight she afforded to Dr. Hill's opinion.

### 2. The ALJ properly denied the Slonaker's claim at step four of the assessment.

At step four of the five step analysis the ALJ must determine if the claimant is capable of performing past relevant work. The ALJ must take into account the claimant's RFC and past relevant work. If past relevant work can be performed, the ALJ must find that the claimant is not disabled. 20 C.F.R. 404.1560(b)(3).

Slonaker contends that the ALJ erred when she found that Slonaker was not disabled because she could perform past relevant work as a shipping clerk. Slonaker supports her contention with her interpretation of the VE's testimony. Specifically, Slonaker suggests that the VE correctly excluded Slonaker from any past relevant work, including the shipping clerk position. Under that assumption, Slonaker argues that the ALJ improperly held that Slonaker could perform past relevant work as a shipping clerk without providing any explanation of why she rejected the VE's contrary testimony.

Slonaker's conclusion that the VE excluded Slonaker from all past relevant work, including the shipping clerk position, expands the scope of the VE's testimony too far. It is true that the ALJ presented hypotheticals with multiple variables to the VE. Among those hypotheticals was one that outlined the identical restrictions included in Slonaker's RFC with the added variable of someone who could never work outside. (Tr. 99-100). After verbalizing the hypothetical, the ALJ elicited the following testimony from the VE.

> ALJ: "Could that [hypothetical] person, in your opinion, perform the claimant's past work?"
>
> VE: "Under that hypothetical, just the work as a stocker could be performed as shown in the DOT."
>
> ALJ: "Okay. And if I added to this hypothetical, again, that the person could only occasionally do fingering or handling, that would eliminate that past work, is that correct?"

15

VE: "Yes."

(Tr. 100-01). Because Slonaker's RFC does not include restrictions on working outside or limit her to occasional fingering or handling, the VE's testimony is consistent with the ALJ's conclusion that Slonaker can perform past relevant work of some kind.

However, Slonaker appears to have discounted this finding because the VE's statement referenced past relevant work as a "stocker" while the ALJ's opinion reflected a holding that Slonaker could only perform past relevant work as a "shipping clerk." As the Commissioner suggests, it is possible that the VE's reference the stocker position was simply a slip of the tongue. The context of the transcript of the hearing seems consistent with such an interpretation. First, at the ALJ's explicit request, the VE classified Slonaker's past relevant work into five positions—psychiatric attendant, shipping clerk, data entry clerk, receptionist, and order clerk—and identified the corresponding DOT numbers[5] for those positions. (Tr. 95-96). Second, the VE only mentioned the stocker position after a lengthy discussion of the shipping clerk position as the only past relevant work that a person with Slonaker's RFC may be able to perform. (Tr. 96-100). Third, the VE never testified as to the DOT number of the stocker position. However, taken literally, the VE's statement could also imply that Slonaker could not perform past relevant work as a shipping clerk.

The parties' arguments thus reflect two conflicting interpretations of the VE's testimony as related to Slonaker's ability to perform past relevant work. "Under SSR 00–4p, an ALJ has an affirmative responsibility to ask whether a vocational expert's evidence conflicts with information provided in the DOT before relying on that evidence to support a determination of nondisability." *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008) (quotations omitted).

---

[5]DOT numbers have been assigned to vocational positions by the Department of Labor and are incorporated into the *Dictionary of Occupational Titles* used in assessing jobs available to applicants for Social Security disability benefits.

Here, the ALJ properly and explicity asked the VE twice whether his testimony conflicted with information in the DOT. (Tr. 101, 106). Importantly, the VE responded both times that there were no conflicts. In addition, Slonaker, through her counsel, did not identify any inconsistencies at the hearing or challenge the VE's assertion in cross-examination. The ALJ did not seek a reasonable explanation for any apparent conflict between the VE's testimony and the DOT, implying that she observed no apparent conflict. *See* SSR 00-4p. The question therefore becomes, does the VE's reference to the stocker position constitute a conflict with the DOT that should have been apparent to the ALJ and would have required an explanation in her decision?

The Court assumes that the ALJ and all present at the hearing heard the VE's reference to the stocker position and recognized that the words "stocker" and "shipping clerk" were different. With such knowledge, the ALJ could have easily clarified the position the VE intended to reference with an additional question during the hearing. Similarly, Slonaker's counsel could have clarified the reference during cross-examination of the VE. Yet, given the context of the VE's testimony, the Court finds any failure on the part of the ALJ to clarify the reference to be harmless error.

Of greater concern is Slonaker's contention that her RFC was inconsistent with the reasoning and reaching requirements of the shipping clerk position. Yet, even here, Slonaker's arguments fail to establish any apparent conflict that the ALJ should have explained. First, Slonaker merely states, without any support, that the reasoning level required for the shipping clerk position was contradicted by the ALJ's holding that Slonaker was limited to simple, routine, and repetitive tasks consisting of one and two step tasks. Slonaker's statement is conclusory and fails to explain the contradiction. With nothing more, the Court is not convinced that there is any conflict, let alone an apparent conflict. Second, Slonaker argues that the

17

"frequent reaching" requirement for the shipping clerk position is at odds with the "no overhead reaching" restriction in Slonaker's RFC. Again, Slonaker provides no support for this assertion. Specifically, Slonaker provides no evidence that the frequent reaching required of shipping clerks would necessarily include any overhead reaching. *See Seamon v. Astrue*, 364 F. App'x 243, 249 (7th Cir. 2010) (refusing to read DOT descriptions expansively to require frequent overhead reaching).

Therefore, the Court finds that the ALJ fulfilled her obligations to inquire about the potential conflicts between the VE's testimony and the DOT listing for the shipping clerk position under SSR 00-4p. In addition, Slonaker has not established any apparent conflict between the VE's testimony and the DOT listing to warrant any further explanation by the ALJ. The ALJ's step four determination that Slonaker was not disabled because she could perform past relevant work is supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ's RFC determination and her conclusion that Slonaker could perform past relevant work as a shipping clerk are supported by substantial evidence. Therefore, Slonaker's motion to remand is **DENIED.** [Doc. No. 27]. This Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk is instructed to term the case and enter judgment in favor of the Commissioner.

**SO ORDERED.**

Dated this 9th day of September, 2013.

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge